# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **REBECCA V. CAMPOS**, individually and on behalf of all others similarly situated, | Case No. 3:15-CV-00629-SI |
| | **OPINION AND ORDER** |
| Plaintiff, | |
| v. | |
| **BLUESTEM BRANDS, INC.** and **WEBBANK**, | |
| Defendants. | |

Bonner Charles Walsh, WALSH, LLC, PO Box 7 Bly, OR 97622; Kelly D. Jones, KELLY D. JONES, ATTORNEY AT LAW, 819 SE Morrison St., Suite 255, Portland, OR 97214; Michael R. Fuller, OLSENDAINES, PC, US Bancorp Tower, 111 SW 5th Ave., 31st Fl., Portland, OR 97204. Of Attorneys for Plaintiff.

Aaron D. Van Oort and Erin L. Hoffman, FAEGRE BAKERS DANIELS LLP, 2200 Wells Fargo Center, 90 South Seventh St., Minneapolis, MN 55402; Brandy A. Sargent and Reed W. Morgan, STOEL RIVES, LLP, 900 SW 5th Ave., Suite 2600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

On October 8, 2014, Plaintiff Rebecca Campos ("Campos") filed an adversary

proceeding against Defendants in U.S. Bankruptcy Court for the District of Oregon. She alleges

that Defendants, with whom she had opened a credit account, willfully violated an automatic stay

by collecting a debt that Campos contends was discharged in her Chapter 7 bankruptcy case. She

brings suit individually and on behalf of all others similarly situated. While the adversary proceeding was before the Bankruptcy Court, Defendants moved to compel arbitration based on a credit agreement for the credit account that Campos opened. Judge Randall L. Dunn issued a Report and Recommendation recommending withdrawal of the reference for Campos's adversary proceeding. Dkt. 1. This Court adopted the Report and Recommendation and now considers Defendant's motion to compel arbitration. For the reasons set forth below, Defendants' motion is deferred pending resolution in either an evidentiary hearing or a jury trial of the factual dispute over whether the parties agreed to arbitration.

## STANDARDS

The Federal Arbitration Act ("FAA"),  9 U.S.C. §§ 1–15, applies to all contracts involving interstate commerce and specifies that "written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). The text of the FAA "leaves no place for the exercise of discretion by a district court," but instead "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* at 218 (citing 9 U.S.C. §§ 3-4) (emphasis in original). The district court must limit itself "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). However, the "liberal federal policy regarding the scope of arbitrable issues is inapposite" to the question whether a particular party agreed to the arbitration agreement. *Comer*

*v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006). The validity of arbitration agreements remains "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Because arbitration is fundamentally "a matter of contract," the FAA "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citations omitted). Courts should also generally "apply ordinary state-law principles that govern the formation of contracts" to determine whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).[1]

A court, not an arbitrator, must decide "the threshold issue of the existence of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991). In deciding whether an agreement to arbitrate existed, a court should apply a summary-judgment-style standard. "Only when there is no genuine issue of fact concerning the formation of the agreement" should the court decide as a matter of law that an agreement to arbitrate existed. *Id.* at 1141 (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). The district court should give the party opposing a motion to compel arbitration "the benefit of all reasonable doubts and inferences that may arise." *Id.* The party seeking to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559,

---

[1] The only exception to the rule that state law governs the validity of arbitration agreements is where courts must "decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago*, 514 U.S. at 944 (quoting *AT & T Technologies, Inc. v. Commc'n Workers*, 475 U.S. 643, 649 (1986)).

565 (9th Cir. 2014). Where "the making of the arbitration agreement" is at issue, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "The court shall hear and determine such issue" if the party alleged to be in violation of the agreement does not demand a jury trial. *Id.*

## BACKGROUND

Applying standards applicable to a motion for summary judgment (Fed. R. Civ. P. 56), the Court draws the following facts from the allegations in Campos's complaint, the parties' papers, declarations, and associated exhibits.

### A. The Arbitration Agreement

Bluestem Brands, Inc. ("Bluestem") is a Delaware corporation with its principal place of business in Minnesota. Dkt. 19 ¶ 2. Bluestem is the parent company of Fingerhut, a retail business that makes products available for purchase through direct mail and Internet shopping channels. *Id.* To allow customers to pay for their Fingerhut purchases on credit, Bluestem developed a loan program with WebBank, a Utah-chartered industrial bank headquartered in Salt Lake City. WebBank issues the Fingerhut credit accounts, and Bluestem services the accounts. *Id.* ¶ 4.

Bluestem mailed Campos a Fingerhut catalog with a prescreened offer of credit. Dkt. 19 ¶ 7. Bluestem asserts that it mailed summary credit disclosures along with the offer. *Id.* Bluestem's summary credit disclosures stated that her credit agreement would contain a binding arbitration provision. Id. ¶ 8. Campos claims she never noticed or read the summary credit disclosures. Dkt. 21 ¶ 11.

On June 1, 2013, Campos called Bluestem using the telephone number in the catalog and applied for a Fingerhut credit account. Dkt. 19 ¶ 9. She provided the Bluestem telephone representative with her mother's address, 18395 NW Chemeketa Lane, Apartment C, Portland, Oregon 97729. She did not, however, reside at that address. Dkt. 19 ¶ 11; Dkt. 21 ¶ 4.

According to Bluestem, every telephone representative follows a script that requires the representative to ask the customer if she agrees to the summary credit disclosures. The representative must then check a box next to the question "Do you agree to the terms and conditions of the account?" If the customer does not agree, the representative must refrain from checking the box and discontinue the application. Dkt. 26 ¶ 6. Campos claims the representative never asked her if she agreed to summary credit disclosures or any terms and conditions relating to the account. Dkt. 21 ¶ 9. Bluestem never claims that the telephone representative would have gone through specific elements of the summary credit disclosures or terms of use with Campos. Bluestem, however, approved Campos's application, and WebBank issued her a credit account. Dkt. 19 ¶ 9.

Bluestem asserts that after the phone call, it mailed Campos a welcome package at 18395 NW Chemeketa Lane, the address she had provided over the phone. The welcome package purportedly contained four items: a welcome letter with a detachable paper card listing a Fingerhut account number, the 2013 WebBank Fingerhut Credit Account Agreement ("2013 WFCAA"), the Fingerhut privacy statement, and the WebBank privacy statement. Dkt. 26 ¶¶ 9-10. According to Bluestem's Vice President, Bluestem records show that on June 2, 2013, Bluestem sent its print vendor a written request to print a welcome package for Campos. Dkt. 26 ¶ 11. Bluestem, however, has not produced records showing that the vendor actually prepared or mailed the package. Campos asserts that she did not receive a welcome package but rather simply received a letter, no more than two pages, with the paper card attached. Dkt. 21 ¶ 12. She remembers receiving the letter approximately ten to fourteen days after applying for the credit account. Dkt. 21 ¶¶ 4, 12.

The 2013 WFCAA stated, "You and WebBank will be bound by this Agreement from the first time a transaction is posted to your Account." Dkt. 19 ¶ 12. Campos made her first Fingerhut purchase using the WebBank account on November 12, 2013. *Id.* The day before her first purchase, she also provided Bluestem with a new address: 11635 Bowmont Street, Portland, Oregon 97225. Dkt. 19 ¶ 14.

Bluestem further asserts that in April 2014 it updated its account agreement and sent a notice of the changes—though not the new agreement—to Campos at her Bowmont Street address. *Id.* Bluestem called the new agreement the WebBank Fingerhut Advantage Credit Account Agreement ("2014 WFACAA"). Dkt. 19 ¶ 15. Both the 2013 and 2014 agreements contained the same choice-of-law provision: "This Agreement and your Account will be governed by federal law applicable to a FDIC-insured institution and, to the extent permitted by law and not preempted by federal law, the law of Utah, without regard to its choice of law provisions." Dkt. 19 ¶ 16. Both the 2013 and 2014 agreements also contained the same arbitration provision:

> **Arbitration. Please review this provision carefully. It provides that any dispute may be resolved by binding arbitration. Arbitration replaces the right to go to court and the right to have a jury decide a dispute. Under this provision, your rights may be substantially limited in the event of a dispute. You may opt out of this Arbitration provision by following the instructions below.**
>
> By accepting this Agreement, unless you opt out by following the instructions below, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement or our relationship resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that dispute in court or to have a jury trial on that dispute . . . . The arbitrator's decision will generally be final and binding. Other rights that you would have if you went to court may also not be available in arbitration. It is important that you read the entire Arbitration provision carefully before accepting the terms of this Agreement.

Dkt. 19 ¶ 17 (emphasis in original). The agreements clarified that both Bluestem and WebBank could invoke the arbitration provision. Dkt. 19 ¶ 18.

The 2013 WFCAA and 2014 WFACAA also stated that unless the account holder opted out of the arbitration provision, the holder "will have waived your right to indicate or participate in a class action related to this agreement." Dkt. 19 ¶ 17. The agreements gave instructions for opting out of the provision:

> You have the right to opt out of this Arbitration provision, but you may only do so in the first 30 days after the first transaction is posted to your Account. In order to opt out, you must write us at WebBank/Fingerhut Arbitration, P.O. Box 1250, St. Cloud, MN 56395-1250. You must inform us of your decision to opt out, and sign the notice.

Dkt. 19 ¶ 19. Campos never provided notice of any decision to opt out of arbitration. Dkt. 19 ¶ 20. She asserts that she never received the 2013 WFCAA, a notice of changes in the agreement, or the 2014 WFACAA, and thus she remained unaware of any binding arbitration clause. Dkt. 21 ¶¶ 14-18.

**B. The Alleged Automatic Stay Violation**

On June 4, 2014, Campos filed for personal bankruptcy. Dkt. 3 ¶ 17. At the time she filed for bankruptcy, she had an outstanding balance on her Fingerhut account. Dkt. 19 ¶ 12. Although Bluestem received notice that Campos filed for bankruptcy, Bluestem sent Campos two letters regarding an application for credit-protection benefits. The first letter acknowledged that Campos had filed bankruptcy. Dkt. 3 at 16. Both letters, however, indicated that Campos should continue to pay her minimum monthly payments unless she received notice that her benefits application had been approved. Dkt. 3 at 16, 18. Bluestem sent the first letter on approximately August 5, 2014. Dkt. 3 at 16. Bluestem sent the second letter on approximately September 15, 2014. Dkt. 3 at 18. On approximately September 19, 2014, Bluestem collected a

payment from Campos. Dkt. 3 ¶ 5. The Court granted Campos's bankruptcy discharge on November 6, 2014, closing her bankruptcy case.

Campos filed this adversary proceeding on October 8, 2014, on behalf of herself and purportedly for a class of others similarly situated. Pursuant to Judge Dunn's recommendation, Campos's bankruptcy case adversary proceeding was withdrawn to the district court.

Campos alleges that Bluestem and WebBank willfully violated the automatic stay on any act to collect, assess, or recover a claim against her pursuant to 11 U.S.C. § 362(a)(6). She seeks class certification, actual damages, punitive damages, injunctive relief, attorney fees, and costs. Defendants argue that the Court should enforce the arbitration agreement Campos purportedly entered when she opened her Fingerhut credit account. Defendants ask that the Court dismiss or stay the adversary proceedings because Campos's claim is subject to the arbitration agreement. In response, Campos argues that (1) the parties never entered a valid arbitration agreement; (2) she cannot effectively vindicate her claim in individual arbitration; and (3) compelling individual arbitration of her claim would inherently conflict with the purposes of the Bankruptcy Code. The Court must first decide the threshold issue of whether a valid arbitration agreement existed.

## DISCUSSION

### A. Choice of Law

The parties agree that federal choice-of-law rules govern. *See In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."). Federal choice-of-law rules incorporate the Restatement (Second) of Conflict of Laws. *Chuidian v. Philippine Nat. Bank*, 976 F.2d 561, 564 (9th Cir. 1992). Under the Second Restatement, the court should enforce a contractual choice-of-law provision unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for

the parties' choice" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws § 187 (1988). The state with the applicable law in the absence of an effective choice of law by the parties is usually the forum state. *See In re Sterba*, 516 B.R. 579, 583 (B.A.P. 9th Cir. 2014).

Here, the 2013 and 2014 agreements both provide that Utah law governs any issues not preempted by federal law, such as whether the parties agreed to arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties disagree regarding whether federal choice-of-law rules dictate that the law of the forum state, Oregon, should apply instead of the law of the purportedly chosen state of Utah.[2]

Critically, however, "whether the choice of law provision applies depends on whether the parties agreed to be bound . . . in the first place." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Campos argues that she never agreed to be bound by either the 2013 WFCAA or 2014 WFACAA. According to Campos, she never received and was never made aware of the 2013 or 2014 agreements. Defendants have not yet offered conclusive evidence that Bluestem sent the agreements to Campos or made her aware of their terms. The printout from Bluestem's vendor lists only the address Campos provided in June 2013 and gives no indication that the welcome package was indeed printed and placed in the mail. Dkt. 26 at 14. Bluestem has provided no additional information from its vendor showing that Bluestem sent the notice of changes or the 2014 WFACAA to Campos. Further, Campos asserts that on June 1, 2013, she

---

[2] Defendants acknowledge that Oregon law would apply in the absence of an enforceable choice-of-law provision.

provided the Bluestem telephone representative with her mother's address and did not live there at the time. Thus, even if the printer had sent the welcome package with the 2013 WFCAA to Campos's mother's house, Campos may never have received it. To the extent Campos received any mailing from Bluestem after the day of the phone call, she asserts that she only got a two-page letter with a detachable card. Bluestem has not offered conclusive evidence that it was impossible for Campos to have received such a letter separate and apart from the full welcome package containing the 2013 WFCAA.

As in *Nguyen v. Barnes & Noble, Inc.*, this case presents a "chicken and egg" question: to determine whether a valid agreement existed, the Court must decide which state's contract law applies; to decide which state's contract law applies, the Court must determine whether a valid agreement existed. *Nguyen v. Barnes & Noble, Inc.*, 2012 WL 3711081, at *3 (C.D. Cal. Aug. 28, 2012), *aff'd*, 763 F.3d 1171 (9th Cir. 2014). The Ninth Circuit has noted that a court "need not engage in this circular inquiry" where the laws of the states in question dictate the same outcome. *Nguyen*, 763 F.3d at 1175. Here, the parties agree that the laws of Oregon and Utah yield the same results.

Moreover, the arbitration clause is severable from the overall contract. The Court need not consider the validity of the purported contract as a whole, which would encompass the choice-of-law provision. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."). Indeed, unless the parties have agreed to withhold the issue from arbitration, the Court has no discretion to decide the contract's overall validity when ruling on motion to stay proceedings pending arbitration. *Id.* at 445-46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the

first instance."); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (holding that under § 3 of the FAA, "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate."). Thus, because the application of Utah law turns on the yet-undetermined issue of whether the parties agreed to all the terms of the 2013 WFCAA or 2014 WFACAA, the Court declines to decide at this time which state's law governs the case.

**B.  Existence of a Valid Arbitration Agreement**

Defendants, as the party seeking to compel arbitration, have the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Because the Court does not decide which state's law governs, the Court analyzes the existence of a valid the arbitration agreement in the 2013 WFCAA and 2014 WFACAA under both Oregon and Utah law. As discussed above, the results are the same.

**1.  Contract Formation**

**a.  Oregon Law**

In Oregon, "[w]hether a contract existed is a question of law." *Ken Hood Const. Co. v. Pac. Coast Const., Inc.*, 201 Or. App. 568, 577 (2005), *adhered to as modified on reconsideration*, 203 Or. App. 768 (2006). Parties create a valid contract through "a manifestation of mutual assent to the exchange and a consideration . . . . The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." *Ken Hood Const. Co.*, 201 Or. App. at 578 (quoting Restatement (Second) of Contracts § 17(1) (1981)). To determine if a contract existed, courts will look only to "the parties' objective manifestations of intent, as evidenced by their communications and acts." *Id.* at 578 (citation omitted). Courts will not consider the

parties' "uncommunicated subjective understanding." *Newton/Boldt v. Newton*, 192 Or. App. 386, 392 (2004).

Parties may manifest their mutual assent through conduct rather than words. *Staley v. Taylor*, 165 Or. App. 256, 262 n.6 (2000) ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement."). Two parties need not "have in mind the same idea and intent" to form a contract. *Kitzke v. Turnidge*, 209 Or. 563, 573 (1957). They must only act in a way that "clearly manifested an objective intent" to be bound. *DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford*, 868 F. Supp. 2d 1042, 1053 (D. Or. 2011). "[T]he fact that the parties' may have subjectively attributed different meanings to [a term] is immaterial in regard to whether an enforceable contract was formed" as long as they "expressed mutual assent through conduct." *Id.*

### b. Utah Law

Similarly, Utah treats the existence of a contract as a matter of law. *Herm Hughes & Sons, Inc. v. Quintek*, 834 P.2d 582, 583 (Utah Ct. App. 1992). Parties form a valid contract only when their "mutual assent . . . manifest[s] their intention to be bound by [the contract's] terms." *Bunnell v. Bills*, 13 Utah 2d 83, 86 (1962). Contract formation "requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah 1998) (quoting Restatement (Second) of Contracts, § 17(1) (1981)).

Assent to a contract need not be verbal; "an offeree may accept an offer by conduct if that conduct manifests his or her intent to be bound." *Naimie v. Cytozyme Labs., Inc.*, 174 F.3d 1104, 1111 (10th Cir. 1999) (citing *Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 34–37 (Utah Ct. App. 1993)). To constitute acceptance, however, the conduct must be such that "an objective,

reasonable person is justified in understanding that a fully enforceable contract has been made." *Id.* (quoting *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995)). The conduct must also "manifest 'unconditional agreement to all of the terms of the offer . . . without material reservations or conditions.'" *Id.* (quoting *Cal Wadsworth Constr. v. City of St. George*, 865 P.2d 1373, 1376 (Utah Ct.App.1993), *aff'd*, 898 P.2d 1372 (Utah 1995) (internal quotation marks omitted)). The party claiming a valid contract exists bears "the burden of proof for showing the parties' mutual assent as to all material terms and conditions . . . . Arbitration agreements are not exempt from this rule." *Bybee v. Abdulla*, 2008 UT 35, ¶ 8.

### 2. Whether Campos Objectively Manifested Assent to the Arbitration Agreement

To determine if a valid agreement to arbitrate existed, the Court must decide if Campos's conduct objectively manifested assent to the terms of the arbitration agreement. Under both Oregon and Utah law, the Court cannot reach this determination without evidence that Campos was aware of the arbitration agreement. *See Burgess v. Qwest Corp.*, 546 F. Supp. 2d 1117, 1121 (D. Or. 2008) (holding that the parties did not objectively manifest mutual assent to an arbitration clause where defendant presented no conclusive evidence that plaintiff was made aware of the clause); *Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, ¶ 14, 148 P.3d 983, 987 ("While there is a presumption in favor of arbitration, that presumption applies only when arbitration is a bargained-for remedy of the parties.").[3]

---

[3] For the proposition that "the law recognizes circumstances in which a party who never expressly consented to arbitrate a dispute may surrender his right to go to court," the Utah Supreme Court cited a decision by the Northern District of Texas. *Bybee*, 2008 UT ¶ 9. According to the Northern District of Texas, "Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary." *Am. Express Travel Related Servs. Co. v. Am. Fine Art & Frame Co.*, 2004 WL 1144103, at *2 (N.D. Tex. May 20, 2004). None of these six theories have any application to Campos's case.

Campos asserts that she was never made aware of and never received the arbitration agreement contained in the 2013 WFCAA and 2014 WFACAA. According to Campos, when she called the telephone number in the Bluestem catalog, the telephone representative never went over the terms of the credit agreement with her and never discussed an arbitration clause. Indeed, Campos expressly states that "[t]he representative did not ask me if I agreed to any 'Summary Credit Disclosures' or any terms and conditions related to the account." Dkt. 21 ¶ 9. Campos also asserts that she never received the welcome package that Bluestem claims to have sent her; instead, she only received a two-page welcome letter with a paper card listing her Fingerhut account number. She further asserts that she never received a notice of changes to the credit agreement.

In response to Campos's assertions, Defendants argue that Campos's assent to the arbitration clause can be inferred for two reasons: (1) Bluestem's standard business practices prove that Bluestem would have made Campos aware of the arbitration agreement; and (2) Campos manifested objective assent to the arbitration agreement by using her credit account.

### a. Bluestem's Standard Business Practices as Evidence that Campos Was Aware of the Arbitration Agreement

Defendants argue that Bluestem's standard business practices prove that Bluestem made Campos aware of the arbitration agreement contained in the 2013 WFCAA and 2014 WFACAA. Defendants offer evidence that "[c]onsistent with its standard practice, Bluestem's employee would have asked Campos if she agreed to the Summary Credit Disclosures as stated in the catalog and if she agreed to the terms and conditions of the account." Dkt. 19 ¶ 9. Bluestem's Vice President states, "Bluestem would not have approved Campos's application (and WebBank would not have issued the account) if Campos had not agreed to the Summary Credit Disclosures over the phone." Dkt. 26 ¶ 9. After the phone call, Defendants assert, "[c]onsistent with its

standard practice, Bluestem mailed a copy of the WebBank Fingerhut Credit Account Agreement in a Welcome Packet to Campos." Dkt. 19 ¶ 11. Finally, according to Defendants, "It is Bluestem's standard practice to note in a customer's file if mail is returned as undeliverable. Bluestem's records do not indicate that the Welcome Packet sent to Campos was returned to Bluestem as undeliverable." Dkt. 26 ¶ 12.

Oregon courts look for specific proof of whether a party assented to an arbitration agreement. In *Burgess v. Qwest Corp.*, Qwest argued that the customer consented to the arbitration provision in her wireless service agreement by signing up for the wireless service over the phone. 546 F. Supp. 2d 1117 (D. Or. 2008). According to Qwest, "its standard business practice is to inform the customer during the telephone call that written terms and conditions apply to the service and will be included with the handset subsequently sent to the customer." *Id.* at 1121-22. Applying Oregon law, the Court found evidence of standard business practices insufficient to establish mutual assent to the arbitration agreement. Qwest could not establish a "meeting of the minds" without "evidence specific to the call between plaintiff and defendant or the materials actually provided to plaintiff." *Id.* at 1122. Accordingly, the Court found that Qwest had not demonstrated that the parties objectively agreed to arbitrate claims arising from the wireless service.

Defendants' citation to *Karmolinski v. Equifax Information Services LLC* is unavailing. 2005 WL 7213289, at *2 (D. Or. Oct. 31, 2005). In *Karmolinski*, the Court found that plaintiff had received a copy of the relevant credit card agreement containing an arbitration clause where a bank manager stated that it was "the usual business practice" to mail such agreements to new card holders. *Id.*, at *3. The Court found that "[t]he fact that plaintiff does not recall receiving the Agreement is inadequate to rebut this statement." *Id.* In reaching this conclusion, however, the

Court applied the federal common law mailbox rule and Delaware law, which allows banks to liberally amend credit agreements. *See* Del. Code Ann. tit. 5 § 952(a). Here, even if the Court were to apply the mailbox rule that a letter properly addressed and mailed reached the intended recipient, Defendants have not presented sufficient proof that the 2013 WFCAA was ever addressed and mailed to Campos. Moreover, the customer in *Karmolinski* simply claimed that "he d[id] not recall receiving the agreement." *Karmolinski*, 2005 WL at *3. Campos, on the other hand, specifically asserts that she did not receive the agreement and instead received only a short welcome letter with a detachable card. Dkt. 21 ¶¶ 12-14. Campos offers more than an unsupported assertion that she does not remember getting the agreement in the mail.

Utah courts have also considered whether evidence of standard business practices establishes that a customer was made aware of an arbitration agreement contained in a contract. In Utah, the "minimum threshold for . . . enforcement [of an arbitration agreement is] direct and specific evidence of an agreement between the parties." *McCoy v. Blue Cross & Blue Shield of Utah*, 2001 UT 31, ¶ 17, 20 P.3d 901. "Direct and specific evidence" is only "non-inferential evidence." *Ellsworth*, 2006 UT ¶ 14. Even "the fact that a person's name appears on a contract as a party to it, without more, is not direct and specific evidence that that particular person has assented to the agreement to arbitrate." *Id.* ¶ 18.

Utah has held that general evidence that arbitration agreements were mailed to customers does not establish that a particular customer received and assented to the agreement. *McCoy*, 2001 UT 31. In some circumstances, Utah law does allow for an inference that a document has been mailed to a customer. This inference may be based on "evidence of an office mailing custom and 'that the particular mailing in question occurred pursuant to the established custom.'" *McCoy v. Blue Cross & Blue Shield of Utah*, 1999 UT App. 199, ¶ 20, 980 P.2d 694, *aff'd and*

*remanded*, 2001 UT 31, ¶ 20 (quoting *Litster v. Utah Valley Comty. Coll.*, 881 P.2d 933, 940 (Utah Ct.App.1994)).  To establish office custom, however, "a party must demonstrate the document in question was: (1) prepared for mailing, that is, the document was written, signed, placed in an envelope, addressed, and deposited in the regular place of mailing; and (2) that the party followed the office mailing custom." *Id.* ¶ 20 (citation omitted). The party seeking to establish a mailing custom must "present direct evidence that the arbitration provision was prepared to be mailed specifically to [the individual customer.]" *Id.*

Defendants argue that *McCoy* does not apply to this case because the facts there involved an insurance policy not subject to Utah Code § 25-5-4(2)(e). The statute states that a debtor is bound by a credit agreement, regardless of whether the debtor signed the agreement, if he or she receives a copy of the agreement, the agreement states that using the credit account will constitute acceptance, and the debtor then uses the account. Campos asserts, however, that she never received a copy of the credit agreement. Thus, Defendants have not yet shown that the Utah statute applies to the circumstances presented in this case, and *McCoy* remains instructive.

Defendants have not presented the sort of standard business practices that Oregon and Utah treat as establishing a customer's awareness of an arbitration agreement. The record does not contain specific and undisputed evidence that a telephone representative discussed the terms of the 2013 WFCAA with Campos or that the representative asked Campos if she agreed to the summary credit disclosures. Nor does the record yet show specific and undisputed evidence that Bluestem or its print vendor placed a copy of arbitration agreement or notice of changes in an envelope, addressed the envelope to Campos, and deposited the envelope in the regular place of mailing.

Further, the Court notes that Defendants have not presented evidence of routine practices that other jurisdictions treat as establishing that a customer knew of and assented to an arbitration agreement. Defendants have not presented evidence that Bluestem routinely sent and that Campos routinely received mail such as billing statements at the address where Bluestem purportedly sent the 2013 WFCAA. *See Hoefs v. CACV of Colorado, LLC*, 365 F. Supp. 2d 69, 73 (D. Mass. 2005). Defendants do not present evidence of "a 'permanent message system' that . . . track[s] customer account activity, which includes mailings of notifications and agreements to the customers." *Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 464 (S.D.N.Y. 2004). Defendants have not shown "multi-level quality assurance controls utilized to detect errors" in mailing, such as having "representatives on site at the [print vendor] facility to verify compliance with quality assurance standards." *Marsh v. First USA Bank, N.A.*, 103 F. Supp. 2d 909, 918 (N.D. Tex. 2000). Finally, Defendants have not asserted that the terms of the arbitration agreement were accessible on any website. *See Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (holding that a cable provider's evidence of its consistent practice regarding delivery of subscription agreements and of the conduct of the parties, including the posting of the subscription agreement on the provider's website, constituted prima facie evidence that subscriber was aware of a subscription agreement). Without such specific evidence, whether Campos was aware of the terms of the 2013 WFCAA and 2014 WFACAA remains in dispute.

### b. Campos's Use of the Credit Account as Conduct Manifesting Assent to the Arbitration Agreement

Defendants also argue that Campos's use of her credit account manifests her objective assent to the arbitration agreement. According to Defendants, the Bluestem catalog put Campos on notice that her credit agreement would contain an arbitration clause. The catalog's summary credit disclosures stated:

*Your credit agreement will contain a binding arbitration provision.* In the event of any dispute relating to your agreement, the dispute will be resolved by binding arbitration pursuant to the rules of the American Arbitration Association. Both you and we agree to waive the right to go to court or to have the dispute heard by a jury. You and we will be waiving any right to a jury trial and you will not have the right to participate as part of a class of claimants relating to any dispute with us. Other rights available to you in court may also be unavailable in arbitration. *When you receive your agreement, you should read the arbitration provision in the agreement carefully.*

Dkt. 19 ¶ 8 (emphasis added). In spite of this notice, Defendants emphasize, Campos made purchases with her credit account, thus manifesting her assent to the arbitration clause mentioned by the catalog.[4]

It is possible for a customer to assent to the terms and conditions of a contract through conduct. A credit cardholder who acknowledges receiving a credit agreement and then uses the credit account may be bound to the agreement's terms regardless of whether the cardholder signs the agreement. *Citibank S.D. N.A. v. Santoro*, 210 Or. App. 344, 349 (2006). Defendants, however, do not point to conclusive evidence that Campos acknowledged receiving the agreement. And, indeed, Campos denies it.

Campos also denies having any awareness of the notice in the catalog. In Oregon, use of a service does not constitute assent to all terms of use regardless of whether a customer receives or is made aware of the terms of service. In *Burgess*, this Court declined to enforce two separate arbitration provisions, one in an internet service agreement and the other in a wireless telephone agreement. *Burgess*, 546 F. Supp. 2d at 1121. Qwest argued that the customer agreed to the

---

[4] Critically, the language in this paragraph shows that it was not meant to be a binding arbitration agreement. The catalog stated that the credit agreement *will* contain a binding arbitration provision and that Campos should read the arbitration provision in the credit agreement—not the paragraph in the catalog—carefully. Thus, the paragraph concerning arbitration in the catalog could serve only to put Campos on notice of an arbitration agreement to come; it could not serve as a binding agreement by itself.

arbitration clause contained in the internet agreement "by enrolling in the internet service and by failing to return the modem equipment within thirty days." *Id.* The customer, like Campos, claimed that she had never read or been made aware of the terms of the internet agreement. Without "a signed agreement or documented communications with plaintiff, to establish that plaintiff was aware of the terms of the Internet Agreement and agreed to them," the Court found that the parties never entered a valid arbitration agreement. *Id.* Similarly, the Court declined to enforce the arbitration provision in the wireless agreement where the customer used the service but asserted that she did not recognize the agreement. *Id.* at 1122.

Defendants in this case argue that *Burgess* is distinguishable because the customer cancelled her internet service before it was activated and thus never affirmatively used the service. In contrast, Defendants argue, Campos affirmatively consented to the arbitration agreement by using her Fingerhut credit account. Defendants overlook that even though the customer affirmatively activated her wireless telephone service, the Court declined to enforce the arbitration provision in the wireless agreement as well. While the Court cited an Oregon case holding that "nonaction did not signify acceptance of the arbitration term," the *Burgess* decision did not hinge on a distinction between action and inaction. *Id.* at 1121 (citing *Martin v. Comcast of Cal./Colo./Fla./Or., Inc.*, 209 Or. App. 82, 97 (2006)).

In another case, the Oregon Court of Appeals held that "bill stuffers" containing an arbitration provision did not create a valid arbitration agreement when mailed to existing cable subscribers. *Martin*, 209 Or. App. at 97. In *Martin*, Comcast argued that subscribers manifested their assent to the arbitration provision by continuing to use the cable service. In rejecting that argument, the court noted that "conduct can manifest acceptance of an offer or acquiescence in a modification," but the conduct must demonstrate "an objectively manifested meeting of the

minds." *Id.* at 96-97 (internal citations and quotation marks omitted). Given the context of the arbitration provisions in question, the court found that "a subscriber could easily have continued using Comcast's service without ever being aware of the arbitration clause." *Id.* at 97. Thus, continued use of Comcast's services did not show an objectively manifested mutual assent to the agreement.

According to Defendants, *Martin* is inapposite because Comcast did not include the arbitration agreement in the original subscriber agreement but rather claimed to have added an arbitration provision through a notice of changed terms. In the case at bar, the catalog contained notice of the arbitration agreement, and the arbitration agreement was in the original 2013 WFCAA purportedly sent to Campos. Still, *Martin* remains applicable. The *Martin* court applied the law of contract modification because it found no evidence on the record that Comcast's arbitration provision was in an original subscription agreement. The court, however, noted that it did not necessarily believe that "distinguish[ing] between the law of contract modification and contract formation . . . would make any relevant difference in this case in any event." *Id.* at 96. Many of the cases the court cited regarding contract doctrine related to both to contract formation and modification. *See, e.g.*, *Adair Homes, Inc. v. Jarrell*, 59 Or. App. 80, 84 (1982) ("[B]efore there can be a valid contract there must be a meeting of the minds . . . .").

Utah courts have not squarely addressed whether use of a service binds customers to an agreement where they never received a copy of the agreement. As noted previously, Utah has a statute allowing for enforcement of credit agreements regardless of whether a debtor signed the agreement if "(i) the debtor is provided with a written copy of the terms of the agreement; (ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and (iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor,

requests funds pursuant to the credit agreement or otherwise uses the credit offered." Utah Code Ann. § 25–5–4(2)(e); *see MBNA Am. Bank, N.A. v. Goodman*, 2006 UT App 276, ¶ 8.

It remains unclear whether the notice in Bluestem's catalog would suffice under the Utah statute. Utah's case law suggests, however, that Utah courts would be reluctant to enforce all terms of an agreement based solely upon use of a service where the customer never received a copy of the actual agreement and was never made aware of all its terms. A person accepts the terms of a contract only with "definite intention to accept the offer and every part thereof . . . without material reservations or conditions." *Cal Wadsworth Const*, 865 P.2d at 1376 (internal citation and quotation marks omitted). Use of a service may not amount to a "definite intention to accept" every part of an offer, even where a customer received a notice such as the one in Bluestem's catalog. The notice stated that Campos should read the future agreement carefully, and the actual agreement in the 2013 WFCAA and 2014 WFACAA contained additional instructions and terms (including the opt-out provision). Without knowledge of these additional terms, Campos may have been unable to possess or manifest definite intent to accept the offer through use of her account.

In a case involving an arbitration clause in an insurance policy, the Utah Supreme Court noted:

> The practical reality is that the lay purchaser is in an inferior bargaining position and simply accepts unilaterally the policy as prepared by the company. Under such circumstances, it would be inequitable and unjust to hold that he had given up so important a privilege as his right to seek justice in court unless it clearly appeared that he was aware of what he was doing, and that he had voluntarily made such a commitment.

*Barnhart v. Civil Serv. Emp. Ins. Co.*, 16 Utah 2d 223, 229 (1965). A statute (Utah Code Ann. § 78-31-1) overruled the legal reasoning in *Barnhart* regarding agreements to arbitrate future claims. More modern cases, however, still echo the *Barnhart* court's overall reluctance to bind

consumers to arbitration clauses of which they were never informed. For example, the Utah

Supreme Court in *Bybee* held that an arbitration agreement did not bind a third-party beneficiary

to its terms. In its decision, the court cited research showing "that the benefits of arbitration are

not as equally distributed as assumed" and "firms generally shun arbitration except against

consumers and employees." *Bybee*, 2008 UT ¶ 36 n.6 (quoting Theodore Eisenberg et. al.,

*Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and*

*Nonconsumer Contracts*, 41 U. Mich. J.L. Reform 871 (2008)). Utah courts may well find that,

given their unequal bargaining power, consumers must at least receive a copy of the actual

arbitration agreement before they can be bound by its terms.

Under both Oregon and Utah law, there is a genuine dispute regarding whether a valid

arbitration agreement existed. Without documented communications with Campos to establish

that she received and was aware of the terms of the 2013 WFCAA and 2014 WFACAA,

Defendants have not proven by a preponderance of the evidence that Campos's conduct

objectively manifested assent to the arbitration agreement, especially in light of Campos's

declaration. Campos's and Defendants' arguments, "no matter how persuasive, do nothing more

than highlight the factual nature of the dispute between the parties." *Fuqua v. Kenan Advantage*

*Grp., Inc.*, 2012 WL 2861613, at *8 (D. Or. Apr. 13, 2012), *report and recommendation*

*adopted*, 2012 WL 2861660 (D. Or. July 11, 2012). As in *Fuqua*, this dispute involves the

credibility of the parties, which the Court cannot determine based on the evidence thus far

submitted. Therefore, before ruling on Defendants' motion, an evidentiary hearing must be held

to determine whether a valid arbitration agreement exists. *See* 9 U.S.C. § 4.

**CONCLUSION**

Because the parties have the right to an evidentiary hearing or a jury trial on the issue whether a valid arbitration agreement exists, the Court defers ruling on Defendants' Motion to Compel Arbitration. Dkt. 3 at 44.

**IT IS SO ORDERED**.

DATED this 30th day of September, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge
