IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **REBECCA V. CAMPOS**, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>**BLUESTEM BRANDS, INC.** and **WEBBANK**,<br><br>       Defendants. | Case No. 3:15-CV-00629-SI<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Bonner Charles Walsh, WALSH, LLC, PO Box 7 Bly, OR 97622; Kelly D. Jones, KELLY D. JONES, ATTORNEY AT LAW, 819 SE Morrison St., Suite 255, Portland, OR 97214; Michael R. Fuller, OLSENDAINES, PC, US Bancorp Tower, 111 SW Fifth Ave., 31st Fl., Portland, OR 97204. Of Attorneys for Plaintiff.

Aaron P. Knoll, Aaron D. Van Oort, Charles F. Webbber, and Erin L. Hoffman, FAEGRE BAKERS DANIELS LLP, 2200 Wells Fargo Center, 90 South Seventh St., Minneapolis, MN 55402; Brandy A. Sargent and Reed W. Morgan, STOEL RIVES, LLP, 900 SW Fifth Ave., Suite 2600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

On June 4, 2014, Plaintiff Rebecca V. Campos ("Plaintiff" or "Ms. Campos") filed for personal bankruptcy. On October 8, 2014, Ms. Campos brought this adversary proceeding on behalf of herself and a putative class in U.S. Bankruptcy Court for the District of Oregon. She alleges that Bluestem and WebBank (collectively "Defendants"), with whom she opened a credit account, willfully violated an automatic stay by collecting a debt that Ms. Campos contends was discharged in her Chapter 7 bankruptcy case. While the adversary proceeding was before the Bankruptcy Court, Defendants moved to compel arbitration based on a credit agreement for the credit account that Ms. Campos opened. Judge Randall L. Dunn issued a Report and Recommendation recommending withdrawal of the reference for Ms. Campos's adversary proceeding. This Court adopted the Report and Recommendation and considered Defenants' motion to compel.

Because there was a genuine dispute regarding whether a valid mandatory arbitration agreement existed, the Court deferred ruling on Defendants' motion to compel pending an evidentiary hearing or a jury trial pursuant to 9 U.S.C. § 4. The parties waived the right to a jury trial, and the Court held an evidentiary hearing on December 15 and 16, 2015. Having weighed and evaluated all of the evidence in the same manner that it would instruct a jury to do and having fully considered the legal arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) and grants Defendants' motion to compel arbitration.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence. The primary factual issues in dispute at the evidentiary hearing were whether Ms. Campos orally agreed to or received in the mail the material terms and conditions of her credit account with Defendants, the WebBank Fingerhut Credit Account Agreement (the "Agreement"). The Agreement contained

an arbitration clause that bars Ms. Campos from bringing a class action or having a jury decide

her case.

**A.  Credibility of Witnesses**

In these findings of fact, the Court relies on the testimony of the following four witnesses

who testified at the evidentiary hearing: Bjorn Anderson, Erik Svensen, Rebecca V. Campos, and

SandraLee Rose D'Adamo. The Court also relies on Ms. Campos's supplemental declaration.

Having observed and considered the testimony of each of the witnesses, the Court concludes that

Defendants' witnesses provided fully credible testimony. The Court has some doubts, however,

regarding the credibility or reliability of the testimony received from both Ms. Campos and Ms.

D'Adamo.

Ms. Campos provided her original declaration, dated August 31, 2015. In this declaration,

she testified that she received a catalog from Fingerhut, a retail business that makes products

available for purchase through direct mail and internet shopping channels. She stated that she

called a telephone number in the catalog to apply for a credit account and that in this telephone

call, "[t]he representative did not ask [her] if [she] agreed to any 'Summary Credit Disclosures'

or any terms and conditions relating to the account." Dkt. 21 ¶ 9. At the time Ms. Campos made

this declaration, Defendants had not yet produced a recording of Ms. Campos's telephone call,

and may have indicated that none could be located.

After the Court set an evidentiary hearing on Defendants' motion to compel, Defendants

found and produced a recording of Ms. Campos's telephone call to Bluestem, Fingerhut's parent

company. The recording established that the representative asked Ms. Campos if she agreed to a

"Summary of the Credit Terms" and that Ms. Campos unequivocally responded "yes." After

receiving and listening to the recording of the telephone call, Ms. Campos submitted a

supplemental declaration dated November 30, 2015. In her supplemental declaration, Ms.

PAGE 3 – OPINION AND ORDER

Campos amended her testimony to state that she "did not remember being asked this question during the phone call at the time [she] made [her] first declaration, because [she] did not know what that the term ['Summary of the Credit Terms'] meant and [she] still [does not] know what it means . . . ." Dkt. 50 ¶ 9. The Court finds no intentional falsehood on the part of Ms. Campos, but the telephone call and conflicting declarations do show that Ms. Campos's memory of some of the events in question, which took place more than two years ago, is less than entirely reliable.

Ms. D'Adamo, Ms. Campos's mother, also testified at the evidentiary hearing. Ms. D'Adamo testified that she remembered seeing Ms. Campos open an envelope that contained two separate pieces of paper, each with writing on only one side. One piece of paper had a Fingerhut card attached to it with Ms. Campos's account number. The other piece of paper had a blank space in the middle. Ms. D'Adamo testified that the envelope did not contain any terms or conditions or a credit account agreement.

At the beginning of her testimony, Ms. D'Adamo stated that some of her friends have had problems with their Fingerhut accounts in the past. According to Ms. D'Adamo, her friends would make payments to Fingerhut, after which Fingerhut would claim not to have received the payments. Now, testified Ms. D'Adamo, she receives Fingerhut catalogues in the mail "two or three times a year and they go straight to the recycle bin." As with Ms. Campos, the Court makes no finding of intentional falsehood by Ms. D'Adamo. Ms. D'Adamo's negative experiences with Fingerhut may, however, have colored her recollection of the Fingerhut mailing that her daughter received more than two years ago.

## B.  Ms. Campos's Fingerhut Credit Application

Bluestem is a Delaware corporation with its principal place of business in Minnesota. Its flagship brand, Fingerhut, sells retail goods to customers through catalogs and Fingerhut's website. WebBank is a Utah-chartered industrial bank headquartered in Salt Lake City, Utah.

PAGE 4 – OPINION AND ORDER

WebBank develops loan programs with companies to provide financing for businesses and consumers. Together, Bluestem and WebBank allow consumers to purchase Fingerhut goods on credit: WebBank provides the financing, and Bluestem serves as the custodian and servicer for all Fingerhut credit accounts.

Bluestem mailed Ms. Campos a Fingerhut catalog with a prescreened offer of credit. On June 1, 2013, Ms. Campos called Bluestem using the telephone number on the Fingerhut catalog and applied for a Fingerhut credit account. She spoke with a Bluestem representative and provided her mother's address, 18395 NW Chemeketa Lane, Apartment C, Portland, Oregon 97729. Ms. Campos did not reside at that address but used it for "important" mailings concerning such things as credit cards.

Bluestem recorded Ms. Campos's call with her consent. Every Bluestem telephone representative follows a script that requires the representative to ask the customer if she agrees to the summary credit disclosures. The recording shows that the Bluestem representative followed the script during the conversation with Ms. Campos:

> **Bluestem Agent:** And do you agree to the summary of the credit terms as stated in the catalog?
>
> **Ms. Campos:** Yes.
>
> **Bluestem Agent:** Okay, and lastly, you [indecipherable] with consent from receiving calls and messages, including autodials and prerecorded message calls from WebBank, Fingerhut, their affiliates, marketing partners, agents, and others calling at their request on their behalf at any cell phone numbers that you have provided or may provide in the future, including any cellular telephone numbers.
>
> And you also agree to give WebBank permission to access your credit report in connection with any transaction, or extension of credit, or on an on-going basis, for the purpose of reviewing your account, adjusting the credit line on your account, taking collection action on your account, or for any other legitimate purposes associated with your account. And upon your request, you will be

PAGE 5 – OPINION AND ORDER

informed of whether or not a consumer credit report was ordered, and if it was, you will be given the name and address of the consumer reporting agency that furnished the report.

So do you agree to the terms and conditions of the account?

**Ms. Campos:** Yes, ma'am.

(Defs. Ex. 201, at 2:50-4:10; *see also* Defs. Exs. 221-22.).

The catalog contained an insert that stated: "This document contains important disclosures about the WebBank/Fingerhut Credit Account, but it is not your complete Credit Account Agreement." Defs. Ex. 220. The insert further stated: "A summary of the key credit terms of the Fingerhut Credit Account can be found above, under the heading 'Summary of the Revolving Credit Account Terms.'" *Id.* A notice about arbitration was below rather than above the sentence concerning where the "summary of the key credit terms" can be found.

The arbitration notice in the catalog stated:

*Your credit agreement will contain a binding arbitration provision.* In the event of any dispute relating to your agreement, the dispute will be resolved by binding arbitration pursuant to the rules of the American Arbitration Association. Both you and we agree to waive the right to go to court or to have the dispute heard by a jury. You and we will be waiving any right to a jury trial and you will not have the right to participate as part of a class of claimants relating to any dispute with us. Other rights available to you in court may also be unavailable in arbitration. *When you receive your agreement, you should read the arbitration provision in the agreement carefully.*

*Id.* (emphasis added). Because the catalog insert did not include the arbitration notice in the "summary of the key credit terms," the arbitration notice was not part of the summary of the credit terms to which Ms. Campos agreed. Additionally, the representative did not discuss the arbitration notice with the other specific terms to which the representative asked Ms. Campos to

agree.[1] During the phone call with the representative, Ms. Campos never agreed to be bound by an arbitration provision.[2]

The same day that Ms. Campos applied for a Fingerhut credit account, Bluestem approved the application and WebBank issued Ms. Campos a Fingerhut credit account ending in '5576. Bluestem asserts that it then sent Ms. Campos a welcome packet that contained, among other things, the Agreement, which included the mandatory arbitration and class action waiver provision.

## C. Defendants' Standard Business Practices

Mr. Svenson is the Vice President of Account Management at Bluestem. His testimony established the procedures that Bluestem uses to send welcome packets, which include standard terms and conditions of Fingerhut credit accounts, to customers. Bluestem followed these procedures in June 2013, when Defendants assert Ms. Campos received her welcome packet.

---

[1] The Court notes that although Bluestem's script required the telephone representative to discuss some specific terms and conditions, the script omitted any discussion of the mandatory arbitration provision. That Bluestem called consumers' attention to some specific terms of the account, such as WebBank's ability to access consumer credit reports, and not to others leads the Court to conclude that Bluestem purposefully chose to omit some terms, including the mandatory arbitration and class action waiver provision. The Court notes that the right to a trial by jury is the only right that appears in both the text of the Constitution, U.S. Const. art. III, § 2, and the Bill of Rights, U.S. Const. amend. VII. Arbitration restricts a party's right to a trial by jury, and consent to such a process should not casually be presumed or slyly be obtained.

[2] Ms. Campos asserted that she never noticed or read any credit disclosures in the catalog. At times, she suggested that the insert that described the terms (Defs. Ex. 220) was missing from her catalog. Mr. Svenson testified that all Fingerhut catalogs contained an insert that summarized the key credit terms and contained a notice that an arbitration provision would be included in the terms and conditions that would govern the account. The inserts were stapled into the spines of the catalogs. Although Ms. Campos's oral agreement to the "summary of the key credit terms" did not constitute an agreement to the arbitration provision, the Court finds that Ms. Campos's acknowledgement of the summary of the credit terms and Mr. Svenson's testimony establish by a preponderance of the evidence that an insert describing the terms that would be included in the Agreement was in the catalog.

Bluestem's standard practice is to batch all approved applications from the previous day and send a data file to its print vendor, Impact Mailing of Minnesota, Inc. ("Impact"). The data file includes information about new accountholders, such as the accountholder's name, address, phone number, email address, credit limit, and open date. The data file instructs Impact to print, put in an envelope, address, and mail to the accountholder a tailored welcome packet. The fields in the data file tell Impact which documents to include in the customers' respective welcome packets. At a minimum, each welcome packet must include four documents: (1) a welcome letter with a detachable card listing the Fingerhut customer and credit account number; (2) the Agreement explaining the account terms and conditions; (3) Fingerhut's privacy notice; and (4) WebBank's privacy notice. Each of these four documents is printed on a single page, front and back.

Bluestem followed this procedure for Ms. Campos. On June 2, 2013, the day after WebBank issued Ms. Campos a Fingerhut credit account, Bluestem batched all approved applications from the previous day and sent Impact a data file containing the new account holders' information. A printout of that data file accurately shows Ms. Campos's application information, including her mother's address, and indicates that Bluestem asked Impact to prepare and mail a welcome packet for Ms. Campos. The instructions for Ms. Campos's welcome packet required the packet to include the welcome letter, the Agreement, and the two privacy notices.

Mr. Anderson is the Director of Finance at Impact. The testimony of Mr. Anderson established the procedure that Impact follows to prepare welcome packets for Bluestem's customers, including Ms. Campos. Impact's standard practice is to send a confirmation to Bluestem that it received and processed all data files containing customers' account information. Using the information in the data files, Impact generates a job ticket with instructions for its laser

printing department, inserting department, and warehouse. The laser-printing department prints the welcome letter for each customer and ensures that the printed count matches the job-ticket count.

The inserting department uses an inserter machine[3] to assemble the other documents—including the Agreement—to create the welcome packets, put the welcome packets into envelopes, and address the envelopes to each customer. The warehouse then loads the envelopes into mail trays and stages the envelopes for pick up by Impact's mailing vendor, Pitney Bowes.

On June 4, 2013, Impact acknowledged receipt of the data file from Bluestem that contained Ms. Campos's account information, including her mother's address. Dfs. Exs. 204-05. When cross-checked with Impact's insert guide for Bluestem job requests, the data file indicates that Ms. Campos, as a resident of Oregon, would have been identified as requiring a welcome letter and the three standard inserts, including the Agreement. Defs. Ex. 205-06. Impact created a ticket for all welcome packets that Impact processed during the week of May 31, 2013, identified as Job No. 88368. Defs. Exs. 224, 215-19. Impact made the welcome packets available to the Pitney Bowes company for mailing and invoiced Bluestem for the job. Defs. Ex. 213.

The parties stipulated to procedures that Pitney Bowes followed. On June 5, 2013, Pitney Bowes picked up the welcome packets from Impact, including a piece of mail addressed to Ms. Campos, 18395 NW Chemeketa Ln, Apt C, Portland, OR 97229-3523. Defs. Ex. 218. Pitney Bowes has the capability of tracing the unique barcode that is placed on each envelope. The

---

[3] Ms. Campos argues that Impact should have used an "intelligent inserter" rather than a "regular inserter" to process the job that included her information. An intelligent inserter is capable of reading barcodes and assembling a greater number of customized combinations of inserts at a given time. Mr. Anderson testified, however, that the intelligent inserter does not decrease the chance of error or provide a better record of what inserts actually go into an envelope than a regular inserter. That Impact used a non-intelligent inserter to process the order for Ms. Campos's welcome packet does not affect the Court's findings.

PAGE 9 – OPINION AND ORDER

unique barcode, printed by Pitney Bowes, for the mail destined for Ms. Campos shows that Pitney Bowes processed the mail for Ms. Campos through its Minneapolis location and transferred that mail to its Des Moines, Iowa, facility. Pitney Bowes last scanned the unique barcode on Ms. Campos's Fingerhut mailing on June 6, 2013, at 12:30 p.m. in Des Moines, after which Pitney Bowes deposited the mail for Ms. Campos with the United States Postal Service in Des Moines.

Ms. Campos and her mother testified that Ms. Campos never received a copy of the Agreement. According to Ms. Campos and her mother, Ms. Campos received a welcome packet that only contained a two-page letter with a detachable card. As discussed above, there are reasons to doubt the reliability of Ms. Campos's and her mother's recollections.

Ms. Campos also offered evidence that there may have been an error in Job No. 88368, resulting in her getting a mailing that failed to include the Agreement. 18,089 welcome packets were sent the week of May 31 to June 6, 2013. Of those welcome packets, 16,142 pieces had three inserts in addition to the standard welcome letter, 34 had four additional inserts, and 1,913 had six additional inserts. As established at trial, the four- and six-insert pieces weighed two ounces for mailing purposes, accounting for a total of 1,947 pieces. When Pitney Bowes weighed job No. 88368, there were only 1,942 two-ounce pieces. According to Ms. Campos, somehow five two-ounce pieces shrunk in weight.

Mr. Anderson testified, however, that the weight Pitney Bowes calculated did not constitute a quality-control measure. Additionally, even if this five-piece discrepancy showed that errors occurred in the two-ounce piece mailing, five errors out of 1,947 pieces is only an approximately 0.2 percent error rate. Ms. Campos asserts that the probability of three inserts getting lost as opposed to one insert indicates that the errors all occurred in the group of four-

insert pieces. This would make the error rate approximately 15 percent. But Ms. Campos

identifies no way of knowing which pieces of mail were affected or whether Pitney Bowes's

weight reflected an error in printing and inserting at Impact or a measuring error at Pitney

Bowes.

## D.  The Arbitration Provision

The Agreement contained an arbitration provision. The provision stated:

> **Arbitration. Please review this provision carefully. It provides that any dispute may be resolved by binding arbitration. Arbitration replaces the right to go to court and the right to have a jury decide a dispute. Under this provision, your rights may be substantially limited in the event of a dispute. You may opt out of this Arbitration provision by following the instructions below.**
>
> By accepting this Agreement, unless you opt out by following the instructions below, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement or our relationship resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that dispute in court or to have a jury trial on that dispute. . . . The arbitrator's decision will generally be final and binding. Other rights that you would have if you went to court may also not be available in arbitration. It is important that you read the entire Arbitration provision carefully before accepting the terms of this Agreement.

Defs. Ex. 209 (emphasis in original).

According to the Agreement, the arbitration provision broadly covers any dispute "arising

from or relating to" Ms. Campos's Fingerhut credit account:

> For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes

PAGE 11 – OPINION AND ORDER

brought as counterclaims, cross claims, or third party claims. . . .
Disputes brought as part of a class action or other representative
basis are subject to arbitration on an individual (non-class, non-
representative) basis. **IF YOU DO NOT OPT OUT, THEN YOU
WILL HAVE WAIVED YOUR RIGHT TO INDICATE OR
PARTICIPATE IN A CLASS ACTION RELATED TO THIS
AGREEMENT**.

*Id.* (emphasis in original).

The arbitration provision instructed Ms. Campos how to opt out of arbitration:

You have the right to opt out of this Arbitration provision, but you
may only do so in the first 30 days after the first transaction is
posted to your Account. In order to opt out, you must write us at
WebBank/Fingerhut Arbitration, P.O. Box 1250, St. Cloud, MN
56395-1250. You must inform us of your decision to opt out, and
sign the notice.

*Id.* Ms. Campos did not opt out of the arbitration provision. She made her first and only

Fingerhut purchase using her credit account on November 12, 2013. Defs. Ex. 226.

## CONCLUSIONS OF LAW

**A.  Choice of Law**

Defendants, as the party seeking to compel arbitration, have the burden of proving the

existence of an agreement to arbitrate by a preponderance of the evidence. *Knutson v. Sirius XM*

*Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). To determine whether a valid arbitration

agreement exists, federal courts "apply ordinary state-law principles that govern the formation of

contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties

disagree on whether Utah law—as provided for in the Agreement—or Oregon law—the law of

the forum state—governs. Under the *Restatement (Second) of Conflict of Laws*, the court should

enforce a contractual choice-of-law provision unless "the chosen state has no substantial

relationship to the parties or the transaction and there is no other reasonable basis for the parties'

choice" or "application of the law of the chosen state would be contrary to a fundamental policy

of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Restatement (Second) of Conflict of Laws* § 187 (1988). In the absence of an effective choice of law by the parties in a case involving a contract dispute under state law, the choice-of-law rules of the forum state would usually apply. *See In re Sterba*, 516 B.R. 579, 582-83 (B.A.P. 9th Cir. 2014).

The choice-of-law provision does not, however, govern the threshold question of whether the parties formed a valid contract. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Additionally, the arbitration clause is severable from the overall contract, and the Court need not consider the validity of the purported contract as a whole, which would encompass the choice-of-law provision. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.").

The Court previously deferred ruling on the choice-of-law question. Dkt. 28 at 11. Now, as it would when sitting in a diversity case, the Court looks "to the law of the forum state," here, Oregon, to determine the law that governs whether the parties agreed to be bound by the arbitration clause. *Nguyen*, 763 F.3d at 1175. When no true conflict exists between the policies or interests of two states, an Oregon court may do "what comes naturally and appl[y] Oregon law." *Erwin v. Thomas*, 264 Or. 454, 459-60 (1973). The parties agree that both Utah and Oregon law dictate the same result. Finding no true conflict, the Court applies Oregon contract law in this case.

**B. Contract Formation**

In Oregon, "[w]hether a contract existed is a question of law." *Ken Hood Const. Co. v. Pac. Coast Const., Inc.*, 201 Or. App. 568, 577 (2005), *adhered to as modified on*

*reconsideration*, 203 Or. App. 768 (2006). Parties create a valid contract through "a manifestation of mutual assent to the exchange and a consideration. . . . 'The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.'" *Id.* at 578 (quoting *Restatement (Second) of Contracts* § 17(1) (1981)). To determine if a contract existed, courts will look only to "the parties' objective manifestations of intent, as evidenced by their communications and acts." *Id.* Courts will not consider the parties' "uncommunicated subjective understanding." *Newton/Boldt v. Newton*, 192 Or. App. 386, 392 (2004).

Parties may manifest their mutual assent through conduct rather than words. *Staley v. Taylor*, 165 Or. App. 256, 262 n.6 (2000) ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement."). Two parties need not "have in mind the same idea and intent" to form a contract. *Kitzke v. Turnidge*, 209 Or. 563, 573 (1957). They must only act in a way that "clearly manifested an objective intent" to be bound. *DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford*, 868 F. Supp. 2d 1042, 1053 (D. Or. 2011). "[T]he fact that the parties' may have subjectively attributed different meanings to [a term] is immaterial in regard to whether an enforceable contract was formed" as long as the parties "expressed mutual assent through conduct." *Id.*

### 1.  Receipt of the Agreement

Oregon courts look for specific proof of whether a party assented to an arbitration agreement. *Burgess v. Qwest Corp.*, 546 F. Supp. 2d 1117, 1122 (D. Or. 2008) (holding that Qwest could not establish a "meeting of the minds" without "evidence specific to the call between plaintiff and defendant or the materials actually provided to plaintiff"); *Martin v. Comcast of Cal./Colo./Fla./Or., Inc.*, 209 Or. App. 82, 97 (2006) (holding that the plaintiff's

PAGE 14 – OPINION AND ORDER

presentation of an example of the type of agreement reportedly sent to cable subscribers and the context in which it was sent was insufficient to show that the parties assented to an arbitration provision).

At the hearing, Defendants proffered evidence specific to the materials provided to Ms. Campos. Mr. Svensen and Mr. Anderson both gave detailed information about the steps taken to accurately print, assemble, and mail welcome packets, including the set of welcome packets of which Ms. Campos was one intended recipient.[4] Ms. Campos presented some evidence supporting her assertion of a 0.2 percent error rate in the mailing of which Ms. Campos's welcome packet was a part. The standard here, however, is preponderance of the evidence rather than beyond a reasonable doubt. Defendants, as the party seeking to compel arbitration, need only slightly tip the scales in their favor in order to prevail. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). This they have done. Unlike in *Burgess*, Defendants presented substantial evidence that their "standard business practices were followed." 546 F. Supp. 2d at 1122. The Court concludes that Defendants proved by a preponderance of the evidence that Ms. Campos's welcome packet was properly printed, assembled, and mailed, and, thus, that it contained the standard terms and conditions statement.

Oregon courts recognize the long-standing common law principle that a letter properly addressed and mailed is presumed to have been received. *Start v. Shell Oil Co.*, 202 Or. 99, 123 (1954) ("The fixed methods and systematic operation of the Government's postal service have

---

[4] Although Defendants presented circumstantial evidence, courts recognize that circumstantial and direct evidence are of equal dignity. *See United States v. Polizzi*, 500 F.2d 856, 904 (9th Cir. 1974) ("But 'circumstantial evidence is not inherently less probative than direct evidence . . . .'") (quoting *United States v. Nelson*, 419 F.2d 1237, 1239 (9th Cir. 1969)); *Oregon v. Cunningham*, 320 Or. 47, 63 (1994) ("For purposes of analyzing the sufficiency of evidence, there is no distinction between direct and circumstantial evidence as to the degree of proof required.").

been long conceded to be evidence of the due delivery to the addressee of mail matter placed for

that purpose in the custody of the authorities. The conditions are that the mail matter shall appear

to have conformed to the chief regulations of the service, namely, that it shall have been

sufficiently prepaid in stamps, correctly addressed, and placed in the appropriate receptacle."

(quoting 1 *Wigmore on Evidence* (3d ed.) 524 § 95) (quotation marks and emphasis omitted)).

Oregon has codified this presumption. Or. Rev. Stat. ("ORS") § 40.135(1)(q) ("A letter duly

directed and mailed was received in the regular course of the mail."). A party may, however,

rebut this presumption with evidence in the record. *Venture Properties, Inc. v. Parker*, 223 Or.

App. 321, 349 n.17 (2008).

The testimony of Ms. Campos and Ms. D'Adamo was insufficient to rebut the

presumption that Ms. Campos received the properly addressed and mailed welcome packet,

containing the Agreement. As noted above, reasons exist to doubt the reliability and accuracy of

Ms. Campos's and Ms. D'Adamo's recollections. The Court finds that although Ms. Campos and

Ms. D'Adamo may not remember seeing the Agreement, Ms. Campos did in fact receive a copy

in June 2013.

### 2.  Ms. Campos's Manifestation of Assent

It is possible for a customer to assent to the terms and conditions of a contract through

conduct. In Oregon, use of a service does not constitute assent to all terms of use regardless of

whether a customer receives the terms of service. *Burgess*, 546 F. Supp. 2d at 1121 (holding that

the parties never entered a valid arbitration agreement where the defendant presented no "signed

agreement or documented communications with plaintiff, to establish that plaintiff was aware of

the terms of the Internet Agreement and agreed to them"); *see also Martin*, 209 Or. App. at 97

(noting that conduct can manifest acceptance of an offer if the conduct demonstrates "an

objectively manifested meeting of the minds").

A credit cardholder who *actually* receives a credit agreement and then uses the credit account may, however, be bound to the agreement's terms regardless of whether the cardholder signs the agreement or verbally assents to it. *See Citibank S.D. N.A. v. Santoro*, 210 Or. App. 344, 348-49 (2006) ("On appeal, defendant does not dispute that he received the agreement in the mail and used the credit card. . . . We conclude that his conduct constituted an acceptance of the agreement."). Moreover, failure to read an agreement does not preclude the agreement's enforcement. *NW Pac. Indemnity v. Junction City Water Dist.*, 295 Or. 553, 557 n. 4 (1983), *modified on other grounds*, 296 Or. 365 (1984) ("[F]ailure to read an instrument is not a defense to enforcement."). The Oregon Supreme Court has found that a consumer may be bound by an agreement's terms, such as coverage exclusions in an insurance policy, "even though he is unaware of those terms because he has failed to read the policy, or having read the policy misunderstands it." *Knappenberger v. Cascade Ins. Co.*, 259 Or. 392, 398 (1971).

Ms. Campos argues that *Martin*, 209 Or. App. 82, and *Burgess*, 546 F. Supp. 2d 1117, establish that a consumer will not be bound by an arbitration agreement of which she is unaware. In *Martin*, the Oregon Court of Appeals held that "bill stuffers" containing an arbitration provision did not create a valid arbitration agreement when mailed to existing cable subscribers. 209 Or. App at 97. The *Martin* court stated:

> The record contains an example of the type of "bill stuffer" reportedly sent to cable subscribers, and the context in which it was sent. Those documents support the inference that a subscriber could easily have continued using Comcast's service without ever being aware of the arbitration clause. Indeed, the lead plaintiff, Martin, averred that she was unaware of receiving the notices that purported to change her cable subscription. Evidence, then, supports the court's finding that nonaction did not signify acceptance of the arbitration term.

*Id.*

In *Burgess*, the defendant asserted that the plaintiff "would have been required to accept" the terms of an agreement during a telephone call and "would have received a copy" of the agreement in the mail. 546 F. Supp. 2d at 1121-22. The defendant did not present specific evidence that the plaintiff agreed to the terms during the telephone call, received the agreement in the mail, or "was made aware of and agreed to the arbitration clause contained in the [agreement] or to the agreement itself." *Id.* at 1122. The *Burgess* court therefore held the following: "In the absence of anything other than conclusory statements regarding defendant's standard business practices contained in defendant's motion and affidavits, [the court] find[s], as a matter of law, that the parties did not enter into an agreement to arbitrate." *Id.* at 1122.

*Martin* and *Burgess* are both distinguishable from Ms. Campos's case. In *Martin*, the plaintiffs' lack of awareness of the agreement became relevant only in the total absence of any affirmative assent to the agreement. The plaintiffs used their cable accounts before receiving the agreement and continued their use, unchanged, after purportedly receiving the agreements. This non-action could not objectively manifest assent. The defendant also presented no specific proof that the plaintiffs did, in fact, receive the agreement. In contrast, Ms. Campos affirmatively used her credit account for the first time after receiving the Agreement, and her receipt of the Agreement was established with specific evidence. Similarly, the presence of specific evidence, rather than "conclusory statements," that Ms. Campos received the Agreement before using her credit account distinguishes her case from *Burgess*.

Arbitration clauses are not exceptions to the general rules of contract enforcement. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms, . . . .") (citations omitted)). The Federal Arbitration Act ("FAA") "was created to counter

prevalent judicial refusal to enforce arbitration agreements." *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013). The statute embodies "'a liberal federal policy favoring arbitration.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Trial courts may not refuse to enforce valid arbitration agreements. *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (stating that the FAA "'requires courts to enforce the bargain of the parties to arbitrate'") (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).[5]

The Court concludes that Ms. Campos received the Agreement and, after receiving the Agreement, used her Fingerhut credit account. This conduct, regardless of whether Ms. Campos read, signed, or understood the Agreement, objectively manifested assent to the arbitration provision contained in the Agreement. Her conduct manifested assent to the Agreement particularly because the catalog stated that Ms. Campos's "credit agreement will contain a binding arbitration provision" and that she "should read the arbitration provision in the agreement carefully." The catalog put Ms. Campos on notice that an arbitration provision, along with additional terms and conditions, would be forthcoming. Additionally, Ms. Campos testified that she had applied for and received other credit accounts before applying for the Fingerhut account and she knew that credit accounts came with terms and conditions, including, sometimes, arbitration provisions. Ms. Campos's awareness that terms and conditions govern

---

[5] The FAA leaves courts very little discretion to decline to enforce valid arbitration agreements. In some cases, as in this case, the lack of discretion may require district courts to enforce arbitration clauses against consumers who do not realize the implications of waiving the constitutional right to a jury trial until too late. As in this case, corporations may also do everything possible to ensure that consumers have little actual notice of the fact that they are waiving one of their constitutional rights. Whatever inequity there may be in these policies, however, is not for courts to remedy. That is the province of either Congress or an appropriate agency, such as the Consumer Financial Protection Bureau.

credit accounts bolsters the conclusion that her use of the Fingerhut credit account following receipt of the Agreement manifested assent to the Agreement's terms.

## C. Purpose of the Bankruptcy Code

Ms. Campos argues that even if she agreed to the arbitration provision, forcing her to arbitrate her claim for a violation of the automatic stay provision, 11 U.S.C. § 362(k),[6] on an individual basis conflicts with the underlying purpose of the Bankruptcy Code. According to Ms. Campos, she cannot effectively vindicate her automatic stay claim, as intended by Congress, in individual arbitration. Thus, argues Ms. Campos, the arbitration provision is unenforceable based on the provision's waiver of the ability to bring a class action.

The FAA's mandate that courts enforce "agreements to arbitrate statutory claims," such as an automatic stay violation under § 362(k), "may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). Congressional intent to override the FAA may be apparent from a statute's text, legislative history, or "an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227.

The legislative history does not "speak[] directly to Congress's purpose in enacting § 362(k)." *Servicing Co. v. Schwartz-Tallard (In re Schwartz-Tallard)*, 803 F.3d 1095, 1100 (9th Cir. 2015). The Ninth Circuit recognizes, however, that the text of the statute shows Congress's intent to authorize suit by "*individual* debtors in bankruptcy." *Id.* (emphasis added).  The statute does not discuss class actions. Even if the statute expressly authorized class actions, the Supreme Court has "had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted

---

[6] 11 U.S.C. § 362(k)(1) provides: "Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

collective actions." *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2311 (2013). Moreover, Congress authorized litigation of automatic stay claims in district courts as well as in the bankruptcy court presiding over the debtor's bankruptcy estate. 28 U.S.C. § 1334(b). With no indication that Congress intended to bar arbitration or permit § 362(k) claims to go forward only in limited forums, the text and legislative history of § 362(k) do not conflict with the FAA. This leaves only the possibility of "an inherent conflict" between arbitration in Ms. Campos's case and the underlying purposes of § 362(k).

In the bankruptcy context, the Ninth Circuit distinguishes between "core and non-core proceedings" to determine whether arbitration of a claim would inherently conflict with the underlying purposes of the Bankruptcy Code. *Cont'l Ins. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 671 F.3d 1011, 1020 (9th Cir. 2012). A core proceeding is one that "'invokes a substantive right provided by title 11 or . . . a proceeding that, by its nature, could arise only in the context of a bankruptcy case.'" *Gruntz v. Cnty. of Los Angeles* (*In re Gruntz*), 202 F.3d 1074, 1081 (9th Cir. 2000) (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)) (alteration in original). Courts do not have discretion to decline to compel arbitration of non-core proceedings when the parties have formed a valid arbitration agreement. In contrast, courts may decline to compel arbitration of core proceedings where arbitration conflicts with the Bankruptcy Code's purposes. *Thorpe*, 671 F.3d 1021. A claim for an automatic stay violation is a core proceeding. *Johnston Envtl Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 617 (9th Cir. 1993).

Whether arbitration of a core proceeding would conflict with the underlying purposes of the Bankruptcy Code involves a fact-specific analysis. *See Thorpe*, 671 F.3d at 1022-27. The Ninth Circuit looks to whether a claim is "inextricably intertwined" with the claimant's

bankruptcy, whether arbitration would "prevent[] the coordinated resolution of the debtor-rights" or "delay the confirmation of a plan of reorganization," and whether "the bankruptcy court would lose control over the timing of the reorganization because it would not have control over the timing of the arbitrations." *Id.* at 1022-23.

Ms. Campos argues that arbitration of her claim on an individual basis conflicts with the underlying purpose of the Bankruptcy Code because individual arbitration is not economically viable. Ms. Campos previously emphasized that debtors in individual cases cannot obtain attorney's fees incurred in recovering damages for violations of § 362(k) and that this inability to recover attorney's fees would impair her ability to pursue her claim. *See Sternberg v. Johnston*, 595 F.3d 937, 947-49 (9th Cir. 2009) (holding that a claimant could not recover attorney's fees incurred in an adversary proceeding for damages arising from violation of automatic stay).

After the filing of Ms. Campos's lawsuit, however, the Ninth Circuit decided *Schwartz-Tallard*, 803 F.3d 1095. *Schwartz-Tallard* "jettison[ed] *Sternberg*'s erroneous interpretation of § 362(k) altogether" and held that "§ 362(k) is best read as authorizing an award of attorney's fees incurred in prosecuting an action for damages under the statute." *Id.* at 1098, 1101. This change in the Ninth Circuit's interpretation of § 362(k) makes individual arbitration more economically viable for Ms. Campos. Moreover, the Supreme Court has specifically rejected the argument that an arbitration agreement that includes a class-action waiver is unenforceable when a class action is the only economically feasible means for enforcing statutory rights. *Italian Colors Rest.*, 133 S. Ct. at 2311 n.4. The economic realities of individually arbitrating Ms. Campos's claim for violations of § 362(k) do not create an inherent conflict with the Bankruptcy Code.

Ms. Campos also argues that individual arbitration conflicts with purpose of the Bankruptcy Code for three additional reasons: individual arbitration would (1) deny her the fundamental protections under the Bankruptcy Code; (2) encourage subversion of the automatic stay's remedial scheme; and (3) restrict public notice of Defendants' violation of § 362(k). Ms. Campos's bankruptcy was discharged on November 6, 2014, closing her bankruptcy case. Dkt. 3 at 52. Because the administration of Ms. Campos's bankruptcy estate is now complete, the factors that might ordinarily weigh against arbitration are no longer present. With her bankruptcy case closed, individual arbitration will not interfere with any protections that the Bankruptcy Code would otherwise afford her, nor will arbitration encourage subversion of the automatic stay's remedial scheme. Her claim is not "inextricably intertwined" with her bankruptcy any longer; arbitration will not prevent the coordinated resolution of her rights or delay any plan of reorganization; and the bankruptcy court will not lose control over the timing of the reorganization.

Finally, as in an instructive Second Circuit case, the fact that Ms. Campos brought her claim as a putative class action demonstrates that her claim is not integral to her individual bankruptcy proceeding. *See MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 110 (2d Cir. 2006). By asserting that her claim is representative of a class of allegedly similarly-situated individuals, Ms. Campos acknowledges the lack of a close connection between her claim and the facts of her own underlying bankruptcy case. In light of these considerations, the Court finds no conflict between individual arbitration of Ms. Campos's claim and the Bankruptcy Code.

## CONCLUSION

Based on the evidence presented at the evidentiary hearing and the record in this case, the Court finds that the parties formed a valid arbitration agreement and that individual arbitration of Ms. Campos's claim under 11 U.S.C. § 362(k) does not conflict with the underlying purpose of

the Bankruptcy Code. The Court therefore GRANTS Defendants' Motion to Compel Arbitration. Dkt. 3 at 44-65. Although the FAA authorizes a court to stay an action that is subject to a valid agreement to arbitrate, 9 U.S.C. § 3, a court can dismiss an action, rather than merely staying it, when all of the issues are arbitrable. *Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) ("The district court acted within its discretion when it dismissed [the plaintiff's] claims. As in [*Martin Marietta Aluminum, Inc. v. General Electric Co.*, 586 F.2d 143 (9th Cir. 1978)], the arbitration clause was broad enough to bar all of the plaintiff's claims since it required [the plaintiff] to submit all claims to arbitration."). Because Ms. Campos's only claim is subject to arbitration, the Court finds that dismissal is appropriate.

DATED this 22nd day of January, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge